IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action 14-cv-03359-CMA-MJW

MARCUS LESSARD,

Plaintiff,

v.

TRACI CRAVITZ, et al.,

Defendants.

---

## REPORT & RECOMMENDATION ON DEFENDANTS' MOTIONS TO DISMISS
### (Docket Nos. 106, 107, 108, 110, & 140)

---

**MICHAEL J. WATANABE**
**United States Magistrate Judge**

In 2010, Plaintiff Marcus Lessard was arrested and prosecuted for felony

stalking.  In civil proceedings, a permanent protection order ("PPO") was entered

against him, in favor of the alleged victim, Liz LaFemina.  In criminal proceedings,

Plaintiff entered into a plea bargain with the District Attorney's office, wherein Plaintiff

entered a plea of guilty to felony stocking under Colorado's deferred judgment and

sentence ("DJ&S") statute, C.R.S. § 18-1.3-102.  In 2012, Plaintiff successfully

completed the terms of the plea agreement; pursuant to the DJ&S statute, the state

court withdrew Plaintiff's guilty plea and the District Attorney's office dismissed the

charges.  About a year later, Plaintiff filed a motion to vacate the PPO, and he served a

copy of the motion on LaFemina.  The District Attorney's office deemed service of that

motion to be a violation of the PPO—and as a result, Plaintiff is facing new felony

stalking charges, set for trial in state court later this year.

2

In this separate lawsuit under 42 U.S.C. §§ 1983 & 1985, Plaintiff sues LaFemina, the state-court judges, the District Attorney's prosecutors and investigators, the Boulder Police Department officers and evidence technicians, and just about everyone else arguably involved in his prosecutions—as well as anyone who has declined to investigate his allegations since then—alleging a conspiracy to violate his civil rights.  Defendants have all moved to dismiss on various theories.  (Docket Nos. 106, 107, 108, 110, & 140.)  The Court has given Plaintiff every conceivable opportunity to state his case—granting leave to file amended and supplemental pleadings, granting repeated extensions of time, and granting several enlargements of the usual page limitations.  (*See* Docket Nos. 29, 45, 52, 63, 82, 117, 120, 128, & 136.)

One of the motions is not yet fully briefed: LaFemina has not yet filed a reply in support of her motion to dismiss.  Nonetheless, the Court finds that the issues are already fully explicated by the briefing thus far, and no additional purpose will be served by further delay.  *See also* D.C.COLO.LCivR 7.1(d) ("Nothing in this rule precludes a judicial officer from ruling on a motion at any time after it is filed.").  The Court has reviewed the parties' filings (Docket Nos. 106, 107, 108, 110, 121, 122, 130, 133, 138, 139, 140, 142, and 155), taken judicial notice of the Court's entire file in this case, and considered the applicable Federal Rules of Civil Procedure, statutes, and case law. Now being fully informed, the Court recommends that the motions to dismiss be granted and that this case be dismissed in its entirety.

### Facts as Alleged

Plaintiff's second amended complaint runs 215 pages.  Fairly summarized, it alleges as follows.

Plaintiff's 2010 Prosecution

Plaintiff characterizes LaFemina as an ex-girlfriend.  He alleges that they dated for 8 months in high school in 1993, breaking up with an agreement that they would reunite in the future—after each of them had worked through certain psychological issues.  Plaintiff recounts various amounts of correspondence between the two over the following decade, primarily in the form of him mailing unsolicited letters to her, until he stopped doing so from 2003 to 2008.  At some point in 2008 or 2009, Plaintiff "finally then came across LaFemina's email address."  (Docket No. 83 ¶¶ 38–45.)  In 2009 and 2010, Plaintiff sent about 15 emails to LaFemina.  (*Id.* ¶¶ 35, 45–76.)  The emails totaled over 50 pages in length.  (*See id.* ¶ 81.)

Plaintiff lived in Oklahoma at the time, and LaFemina lived in Boulder, Colorado.  (*Id.* ¶ 35.)  At some point in June or July 2010, LaFemina went to the police.  On July 8, 2010, she told the police that she wanted a restraining order.  (*Id.* ¶ 89.)  On July 9, 2010, Plaintiff was arrested in Oklahoma for felony stalking.  (*Id.* ¶¶ 37, 77.)  He spent 19 days in an Oklahoma jail, waiting for extradition to Boulder.  (*Id.* ¶ 77.)

The discovery disclosed to Plaintiff following his arraignment in Boulder included an affidavit for arrest warrant, setting forth LaFemina's complaint and attaching the emails as exhibits.  (*Id.* ¶¶ 79–81.)  The affidavit was written by Traci Cravitz, a

4

detective with Boulder Police Department.  (*Id.*)  The discovery also disclosed a report written by a police analyst who reviewed the emails.  (*Id.* ¶ 82.)

Plaintiff alleges that the investigative report and the affidavit for arrest warrant mischaracterize and misrepresent his emails.  (*See id.* ¶¶ 82–89.)  Plaintiff further alleges that the warrant was not supported by probable cause.  (*Id.* ¶¶ 88, 102–07.)  He alleges that LaFemina's statements to the police, as to the fear and distress caused by Plaintiff's emails, were exaggerated or unwarranted.  (*Id.* ¶ 89.)  Further, he alleges that the police failed to investigate LaFemina's credibility.  (*Id.* ¶ 90.)  Plaintiff itemizes numerous allegedly false statements or misleading omissions by LaFemina or by prosecutors at various points in the prosecution; further, because the allegedly untruthful or misleading statements happen to establish the elements of felony stalking, he alleges that LaFemina and the prosecutors conspired to convict him.  (*Id.* ¶¶ 91–100.)  Plaintiff alleges that the police and/or the prosecutors "coached" LaFemina's false testimony.  (*Id.* ¶¶ 95, 97.)  He also alleges that the emails used as evidence were altered in various ways, to obliterate some words or to emphasize others (*id.* ¶ 100), and that the police uncritically accepted LaFemina's accusations without affording him any presumption of innocence (*id.* ¶ 110).

After Steven Louth was hired as Plaintiff's attorney (*id.* ¶ 122), and after bonding out, Plaintiff returned to Oklahoma (*id.* ¶ 123).  Plaintiff alleges that much of Louth's advice was erroneous (*id.* ¶¶ 124–32), and that Louth tried to persuade Plaintiff to accept a plea deal (*id.* ¶¶ 137–39).  In late September 2010, against his attorney's advice, Plaintiff pleaded not guilty.  (*Id.* ¶¶ 137–39; 142–44.)

5

On October 5, 2010, Plaintiff returned for the PPO hearing.  (*Id.* ¶¶ 145–47.)

Plaintiff alleges that Louth failed to present a competent case at that hearing.  (*Id.*

¶¶ 150–51, 156.)  Plaintiff further alleges that Judge Thomas Reed presided over that

hearing with extreme prejudice against Plaintiff—and that Judge Reed was so

prejudiced because Louth (Plaintiff's attorney) had recently cross-examined the judge's

daughter in an unrelated trial.  (*Id.* ¶ 148.)  Judge Reed's conduct at the hearing, as

alleged by Plaintiff, included issuing threats, limiting testimony, and failing to ask follow-

up questions of the witnesses.  (*Id.* ¶¶ 152–53.)  Plaintiff alleges that, after losing the

PPO hearing, Louth deliberately lied to Plaintiff about his appeal deadlines.  (*Id.* ¶ 159.)

Following the PPO hearing, Plaintiff alleges that both his family and Louth again

pressured him to accept a plea deal.  (*Id.* ¶¶ 160–65.)  Louth refused to seek a

continuance despite Plaintiff's requests (*id.* ¶¶ 171–72), and Plaintiff concluded that

Louth was attempting to coerce him into pleading guilty (*id.* ¶¶ 173–74).  At Plaintiff's

request, Louth requested another meeting with the lead prosecutor, Natasha Anderson,

and received an offer of a two-year deferred judgment.  (*Id.* ¶¶ 175–76.)  Plaintiff,

feeling pressured and rushed, accepted the deal.  (*Id.*)  At the change-of-plea hearing,

Judge Lael Montgomery refused to allow Plaintiff to plead "no contest" and instead

accepted a guilty plea.  (*Id.* ¶¶ 180–90.)  Plaintiff alleges that Louth helped coerce the

guilty plea in order to stay in the "good graces" of the District Attorney's office.  (*Id.*

¶ 199.)

In early 2011, Plaintiff repeatedly asked the District Attorney's office to

investigate the alleged errors and omissions in his prosecution—hoping, to no avail, to

have the office overturn his conviction.  (*Id.* ¶¶ 201–07.)  Plaintiff met the same result

when he asked the "Boulder Police Department's Professional Standards Unit" to

investigate the alleged misconduct.  (*Id.* ¶¶ 208–13.)  Plaintiff met the same result every

time he asked Boulder officials to investigate.  (*Id.* ¶¶ 221–24.)

In November 2012, after completing the terms of his deferred judgment, Plaintiff's

guilty plea was withdrawn and the charges against him dismissed with prejudice.  (*Id.*

¶¶ 214–19.)  In the meantime, Plaintiff had prepared a motion to have his sentence

vacated based on the misconduct he perceived.  (*Id.* ¶ 220.)  That motion was mooted

by the conclusion of his deferred judgment—a result he alleges to be part of covering-

up the alleged misconduct.  (*Id.* ¶¶ 220, 225–27.)

### Plaintiff's 2014 Prosecution

Plaintiff adds allegations related to his 2014 prosecution, purportedly as further

evidence of a pattern-or-practice of unlawful conduct.  He expressly disclaims any intent

to predicate liability on these facts (*id.*, p.86), even though several of his claims (Claims

12, 13, and 14 specifically) are explicitly based on these allegations.

In December 2013, Plaintiff discovered that he could file a motion to set aside the

PPO judgment for fraud upon the court.  (*See id.* ¶¶ 229–30.)  He did so, and served a

copy of the motion on LaFemina.  (*Id.* ¶ 231.)  The District Attorney then arrested him

for violation of the PPO, deeming service of the motion to be unlawful contact.  (*Id.*

¶¶ 231–35.)  Plaintiff alleges many of the same misdeeds in his 2014 prosecution that

he alleges as to his 2010 prosecution: finding LaFemina to be more credible than

warranted; failing to presume Plaintiff to be innocent; mischaracterizing the evidence;

and overlooking evidence presented by Plaintiff.  (*Id.* ¶¶ 236–39, 246–51.)  Further, prosecutors have sought to use records from the 2010 prosecution as evidence in the 2014 prosecution.  (*Id.* ¶¶ 241, 243.)

While the 2014 criminal proceedings were ongoing, Plaintiff filed this suit.  He asked the prosecutor if he would be allowed to serve the complaint in this case on LaFemina.  (*Id.* ¶ 255.)  Plaintiff alleges that in response to this question, and on the pretense of a missed evidentiary hearing, the prosecutor had Plaintiff arrested and again extradited to Boulder.  (*Id.*)

Plaintiff alleges that a number of unlawful acts followed:

- That he was denied his medications while in jail;

- That the paperwork for his extradition was unreasonably delayed;

- That the extradition itself was unlawful;

- That his parents were not allowed to visit him in jail; and

- That, driving back to Oklahoma, his parents were repeatedly confronted and harassed by police cruisers and even a police helicopter.

(*Id.* ¶ 260.)

Plaintiff further alleges that Boulder County is biased against males in domestic-violence proceedings.  (*Id.* ¶¶ 120–21, 158, 240, 264–83.)

<u>Claims for Relief</u>

Plaintiff asserts 19 claims for relief.  In addition to the individual Defendants identified below, almost all of the following claims also include high-ranking officials and public entities, based on an alleged pattern-or-practice theory.

8

- Claims 1, 2, and 3 are asserted against Traci Cravitz (who signed the original affidavit for arrest warrant in 2010) and her immediate supervisor—alleging malicious prosecution, unlawful arrest, and gender discrimination.  (*Id.* ¶¶ 284–323.)

- Claims 4 and 5 are asserted against Karen Lorenz and Natasha Anderson (the Deputy District Attorneys who drafted and signed the criminal complaint and the motion for temporary protection order filed against Plaintiff in 2010)— alleging malicious prosecution based on lack of probable cause for the 2010 prosecution.  (*Id.* ¶¶ 324–54.)

- Claims 6 and 7 are asserted against Cravitz, LaFemina, five "property/evidence techs" from the Boulder Police Department, and certain individuals who rejected Plaintiff's 2011 to 2013 requests for investigation— alleging conspiracy to commit malicious prosecution without probable cause and/or based on gender discrimination.  (*Id.* ¶¶ 355–403.)

- Claim 8 is asserted against Anderson (the lead prosecutor in Plaintiff's 2010 case), Louth (his defense attorney in that case), the prosecutor from his 2014 case, and a police investigator—alleging conspiracy to violate Plaintiff's due process rights by coercing him into a guilty plea.  (*Id.* ¶¶ 404–25.)

- Claim 9 is asserted against several prosecutors and investigators from the Boulder District Attorney's office, Louth, and the judges who presided over Plaintiff's bond setting, PPO hearing and change-of-plea/sentencing hearing—alleging conspiracy to violate Plaintiff's equal protection rights by coercing him into a guilty plea.  (*Id.* ¶¶ 426–58.)

- Claim 10 is asserted against more or less every Defendant in this case— combining Claims 6 and 8, and alleging a conspiracy to maliciously prosecute Plaintiff in violation of his 4th Amendment and 14th Amendment rights by *both* unlawful arrest *and* coercing him into a guilty plea.  (*Id.* ¶¶ 459–70.)

- Claim 11 is asserted against most of the Defendants in this case—combining Claims 7 and 9, alleging a conspiracy to unlawfully arrest Plaintiff and coerce him into a guilty plea because of his gender, in violation of his equal protection rights.  (*Id.* ¶¶ 471–86.)

- Claims 12 and 13 are asserted against the prosecutor in Plaintiff's 2014 criminal case—alleging that several steps related to that proceeding have been taken in retaliation for requesting investigations into the 2010 proceeding, and filing the instant lawsuit, in violation of Plaintiff's First Amendment rights of speech and access to the courts.  (*Id.* ¶¶ 487–516.)

- Claim 14 is asserted against the prosecutor in Plaintiff's 2014 criminal case, and also Cravitz (who signed the original 2010 affidavit for arrest warrant, and who testified at a competency hearing in 2014 criminal case)—alleging the same injuries as in Claims 12 and 13, but under a legal theory of conspiracy to obstruct justice. (*Id.* ¶¶ 517–29.)

- Claims 15, 16, 17, and 18 are asserted against District Attorney Stan Garnett, Chief of Police Greg Testa, and various public entities—alleging supervisory liability, liability for failure to prevent, and *Monell* liability, for the constitutional violations alleged throughout the complaint. (*Id.* ¶¶ 530–72.)

- Finally, Claim 19 is asserted solely against LaFemina—for malicious prosecution. (*Id.* ¶¶ 573–91.)

## **Barriers to Suit**

All Defendants raise at least one barrier to suit or affirmative defense. Such arguments can be raised on a motion to dismiss, but can succeed only if the complaint itself (with all reasonable inferences drawn in the plaintiff's favor) establishes the defense. *ASARCO, LLC v. Union Pac. R.,* 765 F.3d 999, 1004 (9th Cir. 2014); *Bullington v. United Air Lines, Inc.,* 186 F.3d 1301, 1311 n. 3 (10th Cir. 1999) ("Rule 12(b)(6) is a proper vehicle for dismissing a complaint that, on its face, indicates the existence of an affirmative defense such as noncompliance with the limitations period"), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101 (2002).

## I. *Heck v. Humphrey*

Several Defendants argue that *Heck v Humphrey*, 512 U.S. 477 (1994), prohibits Plaintiff from using a § 1983 suit to challenge his 2010 prosecution without first overturning that conviction directly or collaterally. However, the precedent in this District holds that *Heck* does not apply after a guilty plea has been withdrawn, and charges

10

dismissed, under Colorado's deferred-judgment statute. *Adams v. Soyka*, No. 11-CV-00399-LTB-MEH, 2011 WL 4915492 (D. Colo. Oct. 14, 2011); *see also Klen v. City of Loveland*, 661 F.3d 498, 515–16 (10th Cir. 2011) (in context of Colorado's deferred judgment statute, *Heck* does not apply when the restraints on plaintiff's liberty do not trigger a federal habeas remedy and, therefore, conviction cannot be collaterally attacked).

Accordingly, the *Heck* doctrine does not bar Plaintiff's suit.

## II.   Sovereign Immunity

Several Defendants argue that Plaintiff's claims are barred by the Eleventh Amendment and state sovereign immunity.  Here, all of the individual Defendants were employees or alleged agents of (1) the Boulder Police Department, (2) the Office of the District Attorney for the Twentieth Judicial District (which encompasses Boulder County), or (3) the Combined Courts for the Twentieth Judicial District.  Further, Plaintiff names the City of Boulder, the County of Boulder, the Boulder Police Department, and the Boulder District Attorney's office as Defendants.

Plaintiff's official-capacity claims are treated as claims against the public entity itself.  *Kentucky v. Graham*, 473 U.S. 159, 166–67 (1985); *Brandon v. Holt*, 469 U.S. 464 (1985).  Congress abrogated sovereign immunity for municipalities when it enacted § 1983, but not for instrumentalities of the states.  *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).  Thus, Plaintiff's claims against public entities and against public employees in their official capacities are barred to the extent the entities/employers are arms of the state.

11

The Boulder Police Department is unquestionably part of the municipality of Boulder; thus, its officials can be sued under *Monell* in their official capacity. *See id.* But the City of Boulder—the real party in interest—is already named as a Defendant, so these official-capacity claims are entirely redundant. *See, e.g.*, *Rooker v. Ouray Cnty.*, 841 F. Supp. 2d 1212, 1216 (D. Colo. 2012), *aff'd*, 504 F. App'x 734 (10th Cir.) (dismissing redundant official-capacity claims). Likewise, the Boulder Police Department is not a suable entity; the city is the proper defendant. *See Martinez v. Winner*, 771 F.2d 424, 444 (10th Cir. 1985); *Renalde v. City & Cnty. of Denver,* 807 F.Supp. 668, 675 (D. Colo. 1992) ("A police department is not a suable entity.") (citing *Boren v. City of Colo. Springs,* 624 F. Supp. 474, 479 (D. Colo. 1985)). Thus, the official-capacity claims against city officials, and the claims against the Boulder Police Department, should all be dismissed as redundant.

The District Attorney's office is an instrumentality of the state, entitled to assert sovereign immunity. *Van De Weghe v. Chambers*, 569 F. App'x 617, 621 (10th Cir. 2014); *Sanchez v. Hartley*, 65 F. Supp. 3d 1111, 1125–26 (D. Colo. 2014). Both it and its employees (in their official capacities) can assert sovereign immunity. Thus, the official-capacity claims against employees of the District Attorney's office, and the claims against the District Attorney's office itself, should all be dismissed.

Finally, the Court concludes that the Combined Courts for the Twentieth Judicial District is also an instrumentality of the state for purposes of the Eleventh Amendment. *See Mumford v. Basinski*, 105 F.3d 264, 267 (6th Cir. 1997) ("A state court is not a 'person' for purposes of 42 U.S.C. § 1983 and hence is not subject to lawsuit under that

statute.); *Harris v. Missouri Court of Appeals, W. Dist.*, 787 F.2d 427, 429 (8th Cir. 1986) ("Missouri state courts, however, must be deemed a part of the State of Missouri, and its adjudicative voice."). Thus, the official-capacity claims against former judges should be dismissed.

The Court recommends that all individual Defendants be dismissed insofar as they are sued in their official capacity, and that the Boulder Police Department and the Boulder District Attorney's Office be dismissed entirely.

## III.   Judicial Immunity

Judge Montgomery and Judge Reed are former judges who presided over portions of Plaintiff's 2010 proceedings. They argue that the doctrine of judicial immunity bars the individual-capacity claims against them.

The doctrine of judicial immunity provides that judges are immune from suit for their judicial acts so long as the judicial acts are not done in the "clear absence of jurisdiction." *Bradley v. Fisher,* 80 U.S. 335, 351 (1871). "Judges of courts of superior or general jurisdiction are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly." *Id.* at 351. "Nor can this exemption of the judges from civil liability be affected by the motives with which their judicial acts are performed. The purity of their motives cannot in this way be the subject of judicial inquiry." *Id.* at 348. Judicial immunity was not abrogated by § 1983. *Pierson v. Ray,* 386 U.S. 547 (1967), *reversed on other grounds in Harlow v. Fitzgerald,* 457 U.S. 800 (1982). Judicial immunity

applies even if the judge acts in concert with non-immune co-conspirators.  *Dennis v. Sparks,* 449 U.S. 24, 28 (1980)

In *Stump v. Sparkman*, the Supreme Court clarified that judicial immunity applies to (1) judicial acts, (2) within the scope of the judge's jurisdiction.  435 U.S. 349, 356 (1978).  The Court also expanded upon the requirement of a "judicial act," stating that it is "the nature of the function performed, not the identity of the actor who performed it" that informs the immunity analysis.  *Id.* at 362.  When determining if the act is judicial, it is appropriate to consider "the nature of the act itself, *i.e.,* whether it is a function normally performed by a judge," and "the expectations of the parties, *i.e.,* whether they dealt with the judge in his official capacity."  *Id.*

Here, Plaintiff makes three arguments against judicial immunity.  He argues first that liability should attach to non-judicial acts.  He then presents two arguments that liability should attach to judicial acts, also.

*Non-Judicial Acts.*  Plaintiff argues that Judge Montgomery and Judge Reed conspired with the non-judicial Defendants in this case and should face liability along with those co-conspirators for those non-judicial actions.  Because this argument explicitly relates to non-judicial acts, it doesn't directly implicate judicial immunity.  But even so, the facts as alleged fail to plausibly plead any conspiracy on the part of Judge Montgomery and Judge Reed.  Plaintiff alleges that Judge Reed is a feminist, and that Judge Reed had a personal grudge against Louth (despite being a co-conspirator with Louth); these are the only allegations in the complaint having any bearing on the judicial Defendants' motivations.  There are no allegations at all about Judge Montgomery's

14

motives or state of mind.  This is insufficient factual content to support any inference at

all as to a conspiracy—and therefore, insufficient to allege liability based on the other

Defendants' non-judicial acts.  As a result, the only acts of the judicial Defendants

actually at issue in this case are the acts taken in their roles as judges—their judicial

acts, for which they have absolute immunity.

*Judicial Acts.*  Plaintiff next argues that Judge Reed acted in the clear absence of

subject-matter jurisdiction.  But Plaintiff fails to identify how Judge Reed lacked

jurisdiction over a PPO hearing assigned to him, arguing only that Judge Reed triggered

the PPO hearings as part of the overall conspiracy and due to a vendetta against

Plaintiff's attorney at the time, Louth.  These arguments fail for a number of reasons.  To

begin with, the vendetta argument is inconsistent with Plaintiff's argument that Louth

was also part of the conspiracy.  But more importantly, provided that the judge had

actual jurisdiction over the matter—which is indisputable here—the judge's motivations

are irrelevant.  "[Judicial] immunity applies even when the judge is accused of acting

maliciously and corruptly . . . ."  *Pierson,* 386 U.S. at 554.

Plaintiff finally argues that the judicial proceeding was so egregiously error-ridden

that it cannot count as judicial.  But "[a] judge is absolutely immune from liability for his

judicial acts even if his exercise of authority is flawed by the commission of grave

procedural errors."  *Stump*, 435 U.S. 359.

The Court concludes that Judge Montgomery and Judge Reed are immune from

liability in this suit, and recommends that the individual-capacity claims against them be

dismissed.

15

## IV.    **Prosecutorial Immunity**

The Defendants who work for the District Attorney's office argue that the

individual-capacity claims against them are also barred.

Absolute prosecutorial immunity is a complete bar to a suit for damages under 42

U.S.C. § 1983.  *Imbler v. Pachtman,* 424 U.S. 409, 419 n. 13 (1976).  The immunity

extends to those activities "intimately associated with the judicial phase of the criminal

process."  *Id.* at 430.  To apply this standard, the Supreme Court applies a "functional

approach" examining only the actions taken by the prosecutor "in initiating [ ] and in

presenting the State's case" for trial.  *Id.* at 431.  Not every activity of a prosecutor

involves initiating and presenting a case: absolute immunity does not extend to "those

aspects of the prosecutor's responsibility that cast him in the *role of an administrator or*

*investigative officer rather than that of advocate*."  *Id.* at 430–31 (emphasis added).

In *Kalina v. Fletcher,* 522 U.S. 118 (1997), a prosecutor was sued for (1)

preparing and filing of an information and motion for an arrest warrant, and (2) attesting

to the truth of the facts contained in the accompanying affidavit.  The Supreme Court

found absolute immunity for the first activity but not for the second.  It concluded the

preparation and filing of the information and motion "was part of the advocate's

function," *id.* at 129, since she acted as an advocate in "her drafting of the certification,

her determination that the evidence was sufficiently strong to justify a probable-cause

finding, her decision to file charges, and her presentation of the information and the

motion to the court . . . indeed, even the selection of the particular facts to include in the

certification to provide the evidentiary support for the finding of probable cause," *id.* at

130.  By contrast, when signing the affidavit attesting to the accuracy of the facts

showing probable cause, the prosecutor acted as a complaining witness rather than a

lawyer.  *Id.* at 129.

The Tenth Circuit recognizes a "continuum based approach," where the "more

distant a function is from the judicial process, the less likely absolute immunity will

attach."  *Roberts v. Kling,* 104 F.3d 316, 318–19 (10th Cir. 1997).  The "determinative

factor is 'advocacy' because that is the prosecutor's main function and the one most

akin to his quasi-judicial role."  *Id.* at 319.  Under this approach, "absolute immunity may

attach even to . . . administrative or investigative activities when these functions are

necessary so that a prosecutor may fulfill his function as an officer of the court."  *Pfeiffer*

*v. Hartford Fire Ins. Co.,* 929 F.2d 1484, 1490 (10th Cir. 1991).

Applying these rules, the Court concludes that Anderson, Lorenz, Peters, and

Johnson are entitled to absolute prosecutorial immunity.  Every act of these Defendants

alleged in the complaint is an act intimately related to initiating or prosecuting the

criminal action, and is therefore entitled to absolute prosecutorial immunity.  *Imbler,* 424

U.S. 409.  The DA's office investigators who are listed as Defendants, by contrast, are

alleged to have manipulated or fabricated evidence as part of the alleged conspiracy;

these are administrative or investigatory acts, not acts of advocacy, and these

Defendants are therefore entitled only to qualified immunity.  *See Mink v. Suthers*, 482

F.3d 1244, 1262–63 (10th Cir. 2007).  The claims against Garnett are barred by

absolute immunity insofar as they are derivative of the claims against Anderson, Lorenz,

Peters, or Johnson.

Plaintiff argues that Anderson, Lorenz, Peters, or Johnson engaged in non-prosecutorial acts, outside of bringing criminal charges and prosecuting the cases against him—such as advising the police and investigators.  But Plaintiff's complaint does not allege such acts in anything more than conclusory fashion.  In 215 pages, the only acts alleged with any specificity to have been taken by these four Defendants are acts well within the prosecutor's role as the state's advocate.  Plaintiff argues specifically that Anderson and Lorenz qualify as complaining witnesses under *Kalina*.  But Plaintiff is wrong.  Under *Kalina*, the complaining witness is whoever signs the affidavit setting forth the facts establishing probable cause—here, that's Cravitz, not Lorenz and Anderson (who prepared and signed the formal complaint, not the affidavit).

Accordingly, the Court recommends that the individual-capacity claims against Anderson, Lorenz, Peters, and Johnson be dismissed, as well as all individual-capacity claims against Garnett that are derivative of the claims against Anderson, Lorenz, Peters, and Johnson.

**V.      *Rooker-Feldman* Doctrine**

Some Defendants argue that Plaintiff's claims are barred by the *Rooker-Feldman* Doctrine.  As recently stated by this Court:

> The *Rooker-Feldman* doctrine is a jurisdictional prohibition based on 28 U.S.C. § 1257 which holds that federal review of state court judgments may be obtained only in the United States Supreme Court. The *Rooker-Feldman* doctrine applies to bar a party losing in state court . . . from seeking what in substance would be appellate review of the state judgment in a United States district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights.  In other words, it applies to cases brought by state-court losers complaining of injuries caused by state court judgments rendered before the district

court proceedings commenced and inviting district court review and
rejection of those judgments.

*Stauffer v. Blair*, Case No. 13-cv-03256-RM-MJW, at *1 (D. Colo. Jan. 15, 2015)

(internal citations and quotation marks omitted).

The doctrine thus prohibits "cases brought by state-court losers complaining of

injuries caused by state-court judgments." *Exxon Mobil Corp. v. Saudi Basic Indus.*

*Corp.*, 544 U.S. 280, 284 (2005).  As an important limitation, however, the doctrine is

*not* akin to res judicata or collateral estoppel; it bars de facto appeals, not relitigation.

As the Supreme Court explained:

> Nor does [the doctrine] stop a district court from exercising subject-
> matter jurisdiction simply because a party attempts to litigate in federal
> court a matter previously litigated in state court.  If a federal plaintiff
> "present[s] some independent claim, albeit one that denies a legal
> conclusion that a state court has reached in a case to which he was a
> party . . ., then there is jurisdiction and state law determines whether the
> defendant prevails under principles of preclusion."

*Exxon Mobil Corp.*, 544 U.S. at 293 (internal citations omitted).

This independent-claim caveat was discussed at length by the Tenth Circuit in

*Bolden v. City of Topeka*, 441 F.3d 1129 (10th Cir. 2006).  There, Judge Hartz

explained:

> *Rooker-Feldman* does not bar federal-court claims that would be
> identical even had there been no state-court judgment; that is, claims that
> do not rest on any allegation concerning the state-court proceedings or
> judgment.  A suit on such claims could not be characterized as an
> "appeal" of the state-court judgment, which is the core concern of *Rooker-*
> *Feldman.*  To illustrate, say a father was deprived of custody of his child
> by a state-court judgment.  If he files suit in federal court, seeking to
> invalidate the state-court judgment on the ground that the state-court
> proceedings deprived him of due process or that the judgment was
> otherwise contrary to federal law, his suit would be barred by *Rooker-*
> *Feldman;* the suit usurps the Supreme Court's exclusive appellate

jurisdiction because it seeks to set aside the judgment based on a review of the prior proceedings.  If, however, the father simply brought suit in federal court seeking custody of his child, without raising any complaint about the state-court proceedings, *Rooker-Feldman* cannot be invoked; his federal claim would have been the same even in the absence of the state-court judgment.  A myriad of doctrines, including res judicata, would almost certainly bar the suit.  But because he is not seeking to overturn the state-court judgment, *Rooker-Feldman* is inapplicable, regardless of whether a favorable judgment in federal court would be inconsistent with that judgment and would "den[y] a legal conclusion that [the] state court has reached."

441 F.3d at 1145 (quoting *Exxon Mobil,* 544 U.S. at 293).

Applying this analysis, the Court concludes that *Rooker-Feldman* does not apply to the claims in this case.  Most of Plaintiff's claims allege an unlawful arrest, malicious prosecution, and gender discrimination.  These claims do not seek to invalidate Plaintiff's PPO or since-dismissed DJ&S.  These claims may be barred by any number of other doctrines, but not *Rooker-Feldman*.

Several of Plaintiff's claims are based on an alleged conspiracy to coerce him into pleading guilty, and those claims would ordinarily appear to be directly based upon a state-court judgment.  But in a deferred-judgment case, no judgment of conviction is entered on the guilty plea.  *See* C.R.S. § 18-1.3-102.  This technical distinction controls a number of details about the effect of the proceedings—including, for example, dictating that there is no "judgment" that can be appealed or collaterally attacked in state postconviction proceedings.  *See, e.g.*, *People v. Corrales-Castro*, ___ P.3d ___, 2015 WL 1650923 (Colo. App. Mar. 26, 2015).  Analogously, the Court concludes that there is no "judgment" for purposes of the *Rooker-Feldman* doctrine.

20

## VI.    *Younger* Doctrine

Claims 12, 13, and 14 are all predicated upon acts taken as part of Plaintiff's 2014 prosecution—which is set for trial in state court, later this year.  The relevant Defendants argue that these claims must be stayed, pending the outcome of the criminal case, under the *Younger* abstention doctrine.

Under *Younger*, "[a] federal court must abstain from exercising jurisdiction when: (1) there is an ongoing state criminal . . . proceeding, (2) the state court provides an adequate forum to hear the claims raised in the federal complaint, and (3) the state proceedings involve important state interests, matters which traditionally look to state law for their resolution . . . ."  *Amanatullah v. Colo. Bd. of Med. Exam'rs*, 187 F.3d 1160, 1163 (10th Cir. 1999).  These elements are easily met with regard to Claims 12, 13, and 14.  Plaintiff's legal theories in these claims all implicate the state's interest in its criminal-justice proceedings, and the theories are all capable of review within the context of the pending criminal case.  Accordingly, to the extent any portion of Claims 12, 13, and 14 are not dismissed entirely,[1] the Court recommends that they be stayed pending the conclusion of Plaintiff's criminal prosecution.

## VII.    Statute of Limitations

As a final bar to suit, most Defendants point out that the 2010 prosecution is well outside of the two-year statute of limitations that applies to most of Plaintiff's claims.

---

[1] Claims 12, 13, and 14 are subject to dismissal based on the Court's discussions of prosecutorial immunity and sovereign immunity, *supra*, and failure to state a claim, *infra*. The Court recommends that Claims 12, 13, and 14 be stayed under *Younger* only in the event District Judge Arguello declines to adopt the recommendations to dismiss under other doctrines.

21

Plaintiff concedes that a two-year statute applies to most of his claims, but argues that the statute does not begin to run until the last act taken in furtherance of the conspiracy—and Plaintiff alleges that the conspiracy continues on even today, in the form of cover-ups and failures to investigate.[2]

Plaintiff's argument misapplies the "last overt act" rule.  It is true that the statute of limitations under 42 U.S.C. § 1985 does not begin to run until the last overt act causing damage to the plaintiff.  *See, e.g.*, *Lyons v. Kyner*, 367 F. App'x 878, 882 (10th Cir. 2010) (citing *Bell v. Fowler,* 99 F.3d 262, 270 (8th Cir. 1996)); *Scherer v. Balkema*, 840 F.2d 437, 439 (7th Cir. 1988).  But simply failing to investigate Plaintiff's claims does not count as a "last overt act."  *See Bell v. Fowler,* 99 F.3d 262, 270–71 (8th Cir. 1996).  Rather, the last overt act must itself be a wrongful—*i.e.*, unlawful—act causing injury to the plaintiff.  As the Colorado Court of Appeals has explained, in the analogous context of Colorado's common law civil-conspiracy tort:

> Civil conspiracy is a derivative cause of action.  The essence of a civil conspiracy claim is not the conspiracy itself, but the actual damages resulting from the acts done in furtherance of the conspiracy.
>
> In the end, it is wrongful acts, not the mere existence or continuation of a conspiracy, that injure the plaintiff.  Consequently, the failure to discover all (or other) participants in a conspiracy does not delay accrual of the cause of action: once a party is aware of an injury and the cause thereof (i.e., in this context, *a* wrongdoer), the party normally has sufficient opportunity, within the applicable limitations period, to discover the identity of other defendants.

---

[2] Plaintiff also argues that the real issue is one of standing and mootness under Article III's case-or-controversy requirement, and that the various exceptions to those doctrines apply.  Because the statute of limitations has nothing to do with Article III's case-or-controversy requirement, the Court declines to address these arguments further.

Because the elements of a civil conspiracy claim require that the underlying acts be unlawful and create an independent cause of action, civil conspiracy claims share a statute of limitations with the underlying tort, and their accrual dates are linked to the accrual dates of the underlying torts.

*Sterenbuch v. Goss*, 266 P.3d 428, 435–36 (Colo. App. 2011) (internal citations, quotation marks, and alterations omitted).  Thus, as soon as the last act comprising a violation of Plaintiff's civil rights was completed, the conspiracy was completed and the statute of limitations began to run.  Those final acts occurred in 2010, and the statute of limitations thus expired in 2012.

The Court thus recommends that Plaintiff's claims be dismissed insofar as they are predicated on his 2010 prosecution and guilty plea—which is all claims except Claims 12, 13, and 14.

### Stating Plausible Claims

Setting aside the legal barriers to suit, all Defendants also argue that Plaintiff fails to plead plausible claims.  Judge Arguello states the applicable legal standards as such:

> . . . In deciding a motion under Rule 12(b)(6), the Court must accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff.  However, a plaintiff may not rely on mere labels or conclusions, and a formulaic recitation of the elements of a cause of action will not do.
>
> To withstand a motion to dismiss, a complaint must contain enough allegations of fact to state a claim to relief that is plausible on its face.  As the Tenth Circuit explained in *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007), "the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."  The burden is on the plaintiff to frame a complaint with enough factual matter (taken as true) to suggest that he or she is entitled to relief. . . .

*Henson v. Bank of Am.,*935 F. Supp. 2d 1128, 1135–36 (D. Colo. 2013) (most quotation marks, internal citations, and alterations omitted).

## I.   <u>Malicious Prosecution</u>

Almost all of Plaintiff's claims allege some variation of malicious prosecution. However, an essential element of a malicious-prosecution claim is that the prosecution must have ended favorably for the plaintiff.  *See Wilkins v. DeReyes*, 528 F. 3d 790, 799 (10th Cir. 2008).   Under the precedent of this District, a guilty plea under Colorado's deferred-judgment statute does not constitute a favorable termination for purposes of malicious prosecution under the Fourth Amendment.  *Ortega v. City & Cnty. of Denver*, No. 11-CV-02394-WJM-CBS, 2013 WL 359934, at *7 & n.5 (D. Colo. Jan. 30, 2013). The result is the same under state law.  *Land v. Hill*, 644 P.2d 43, 45 (Colo. App. 1981). Thus, on the facts as alleged, Plaintiff cannot state a claim for malicious prosecution.

Plaintiff argues that his lack of a favorable termination does not bar this case under *Heck v. Humphrey*.  The Court agrees, as discussed *supra*—but the rule from *Heck v. Humphrey* has no bearing on whether Plaintiff can establish the common-law elements of a malicious-prosecution claim.  *See, e.g.*, *Ortega*, 2013 WL 359934, at *5, 7 (finding no bar under *Heck* but still finding no claim because of deferred-judgment guilty plea).

Thus, the Court recommends that Plaintiff's claims be dismissed for failure to state a claim, insofar as they allege malicious prosecution.

24

## II.   Equal Protection

Many of Plaintiff's claims allege unlawful gender discrimination.  However, such a claim requires a showing of both discriminatory intent *and* discriminatory effect. *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1168 (10th Cir. 2003).  Here, Plaintiff repeatedly alleges both—but he offers nothing more than conclusory allegations on these points.  He alleges no factual content from which an actual discriminatory animus might be inferred, nor factual content from which a discriminatory impact might be inferred.  He alleges, for example, that according to everyone he has spoken to, Boulder has a reputation for discriminating against men in domestic-violence cases. This is much too vague to be described as anything other than conclusory and unsupported.  Further, he alleges that he's been told that Judge Reed is "a feminist." This does not plausibly allege actual animus against men.

Thus, the Court recommends that Plaintiff's claims be dismissed for failure to plausibly allege a claim, insofar as they allege equal-protection violations.

## III.   Due Process

Several of Plaintiff's claims invoke his Due Process rights.  However, all of his claims also fall under doctrines explicitly covered by the Fourth Amendment or the Equal Protection Clause of the Fourteenth Amendment.  "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (internal quotation marks omitted).  As a

result, the Court recommends that Plaintiff's claims be dismissed for failure to plausibly allege a claim, insofar as they allege Due Process violations.

## IV.   _Monell_ Liability

Several of Plaintiff's claims assert liability against supervisors and public entities based on a pattern-or-practice theory, a failure-to-train theory, or a supervisory-liability theory.

The Tenth Circuit recently summarized its guidance on _Monell_ liability as follows:

> A municipality may not be held liable under 42 U.S.C. § 1983 solely because its employees inflicted injury on the plaintiff.  It may only be held liable under § 1983 for _its own_ unconstitutional or illegal policies.  Thus, a municipality is liable only when the official policy or unofficial custom is the moving force behind the injury alleged.  A plaintiff must therefore identify a government's policy or custom that caused the injury.  The plaintiff must then show that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury.  Indeed, where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into _respondeat superior_ liability.

> We recently characterized these required showings as three specific elements: (1) official policy or custom, (2) causation, and (3) state of mind.

> An official policy or custom may take the form of: (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

_Cacioppo v. Town of Vail, Colo._, 528 F. App'x 929, 931–32 (10th Cir. 2013) (internal citations, quotation marks, and alterations omitted; paragraph structure altered).

26

Plaintiff's allegations fail to meet any of these tests.  To begin with, he has not plausibly alleged a malicious-prosecution claim, an equal-protection claim, or a Due Process claim, as explained *supra*.  As a result, there is no liability that might be imputed to the City or the County in the first place.  But beyond that, Plaintiff's allegations amount to nothing more than conclusory statements about the City of Boulder and Boulder County being biased against men in domestic-violence proceedings.  Plaintiff's complaint outlines numerous instances where he disagrees with the evidence against him, and numerous instances where several Defendants failed to interpret that evidence the way he does.  But Plaintiff's own prosecution alone is insufficient to plead a municipal custom or practice.  And in 215 pages, Plaintiff's complaint fails to identify any facts from which the Court might infer that the municipalities' final decision-makers knowingly signed off on unlawful or discriminatory prosecutions.

The Court therefore recommends that Plaintiff's claims be dismissed for failure to plausibly allege a claim, insofar as they allege *Monell* liability.

**V.**      **State-Action Doctrine**

Finally, two Defendants are private citizens: Louth, who was Plaintiff's defense attorney in the 2010 prosecution, and LaFemina, the alleged victim in both prosecutions.  Plaintiff alleges that both have conspired sufficiently closely with the state actors as to be, effectively, state actors themselves.  Both Defendants, for their part, argue that such state action has been insufficiently pleaded.

*Louth.*  A defense attorney acts under color of state law when that attorney conspires with the prosecution to deprive a criminal defendant of constitutional rights. *Tower v. Glover,* 467 U.S. 914, 920 (1984).  And because direct evidence of such a conspiracy is rarely available, plaintiffs must often rely on circumstantial evidence.  *Hunt v. Bennett*, 17 F.3d 1263, 1268 (10th Cir. 1994) (citing *Fisher v. Shamburg,* 624 F.2d 156, 162 (10th Cir. 1980)).  Nonetheless, allegations of state action via conspiracy "must specifically present facts tending to show agreement and concerted action." *Sooner Products Co. v. McBride,* 708 F.2d 510, 512 (10th Cir. 1983).

The only allegation to support any sort of conspiracy is the brief allegation that Louth had won too many cases lately and needed to lose in order to stay in the District Attorney's good graces.  This might support a malpractice claim, but it is insufficient to allege any sort of meeting of the minds between Louth and the prosecution.  Nor does the allegation that Louth failed to advise Plaintiff of his appeals deadlines or other procedural rights add enough circumstantial factual content to support an inference of an agreement.  Further, Plaintiff specifically alleges (and presents a transcript proving) that Louth asked the state court to allow Plaintiff to enter a plea of no contest, rather than a plea of guilty.  Far from alleging concerted action with the prosecution, these allegations suggest the opposite.

Thus, the Court recommends that the claims against Louth be dismissed for failure to plausibly allege actions taken under color of state law.

*LaFemina*.  The Tenth Circuit has characterized the state-action doctrine as having four alternative tests:

> . . . [1] In some instances, the [Supreme] Court has considered whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.  [2] The Court has also inquired whether the state has so far insinuated itself into a position of interdependence with the private party that there is a symbiotic relationship between them.  [3] In addition, the Court has held that if a private party is a willful participant in joint activity with the State or its agents, then state action is present.  [4] Finally, the Court has ruled that a private entity that exercises powers traditionally exclusively reserved to the State is engaged in state action.
>
> Under each of these four tests, the conduct allegedly causing the deprivation of a federal right must be fairly attributable to the State.

*Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447–48 (10th Cir. 1995) (internal citations, quotation marks, and alterations omitted).

Plaintiff's allegations do not establish any of these tests.  The only test conceivably implicated here is the joint-action test.  That test focuses on "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights."  *Id.* at 1453.  But the only allegations regarding LaFemina's interactions with the police are that: (1) she complained to the police about Plaintiff's emails and requested a restraining order; (2) she reacted unreasonably to the emails; (3) the police and prosecutors construed those emails the same way LaFemina did; and (4) LaFemina's complaints appear to be coached because they line up too well with the elements of the charged crime.  This does not plausibly allege that LaFemina and the police and prosecutors acted in concert.  There are no non-conclusory allegations that LaFemina and the prosecutors jointly misrepresented the evidence or lied for purposes of the unlawful arrest, or that LaFemina in any way joined the effort to coerce Plaintiff into pleading guilty.

29

As a result, the Court recommends that the claims against LaFemina be dismissed for failure to plausibly allege actions taken under color of state law.

## **Recommendation**

Collectively, the foregoing conclusions eliminate each of Plaintiff's claims, against each Defendant. It is therefore RECOMMENDED that:

- Motion to Dismiss Second Amended Complaint Pursuant to Fed.R.Civ.P. 12(b)(1) and (b)(6) by Defendants Lael Montgomery and Thomas Reed **(Docket No. 106) be GRANTED**;

- Boulder County Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint and First Supplemental Complaint **(Docket No. 107) be GRANTED**;

- Defendants City of Boulder, Boulder Police Department, Greg Testa, Traci Cravitz, Kerry Yamaguchi, G. Mulvaney, Lucy Batton, Gordon Brown, Cassandra Henrikson, and Erica Solano's Motion to Dismiss Plaintiff's Second Amended Complaint **(Docket No. 108) be GRANTED**;

- Defendant, Steven Louth's, Renewed Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) **(Docket No. 110) be GRANTED**;

- Defendant Liz LaFemina's Motion to Dismiss Plaintiff's Second Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) **(Docket No. 140) be GRANTED**; and

- Plaintiff's Second Amended Complaint as Supplemented **(Docket Nos. 83 & 84) be DISMISSED** in its entirety under Rules 12(b)(1) and 12(b)(6).

30

**NOTICE:  Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b)(2),**

**the parties have fourteen (14) days after service of this recommendation to serve**

**and file specific written objections to the above recommendation with the District**

**Judge assigned to the case.  A party may respond to another party's objections**

**within fourteen (14) days after being served with a copy.  The District Judge need**

**not consider frivolous, conclusive, or general objections.  A party's failure to file**

**and serve such written, specific objections waives de novo review of the**

**recommendation by the District Judge, <u>Thomas v. Arn</u>, 474 U.S. 140, 148-53**

**(1985), and also waives appellate review of both factual and legal questions.**

**<u>Makin v. Colo. Dep't of Corr.</u>, 183 F.3d 1205, 1210 (10th Cir. 1999); <u>Talley v. Hesse</u>,**

**91 F.3d 1411, 1412-13 (10th Cir. 1996).**

Dated:          September 8, 2015              */s/ Michael J. Watanabe*
                Denver, Colorado               Michael J. Watanabe
                                               United States Magistrate Judge